David Warren SAXE, Student Doe 1, by and through his next friend, David Warren Saxe, and Student Doe 2, by and through his next friend, David Warren Saxe, Plaintiffs,

v.

STATE COLLEGE AREA SCHOOL DISTRICT and Constance Martin, in her official capacity as President of the State College Area School District, Defendants.

No. 4:CV–99–1757.

United States District Court, M.D. Pennsylvania.

Dec. 17, 1999.

Bryan J. Brown, Stephen M. Crampton, Brian Fahling, American Family Association, Center for Law & Policy, Tupelo, MS, Scott A. Williams, Williamsport, PA, for plaintiffs.

David B. Consiglio, John R. Miller, Jr., Miller, Kistler, Campbell, Miller, Williams & Benson, State College, PA, for defendants.

### MEMORANDUM

McCLURE, District Judge.

### BACKGROUND:

Earlier this year, the Supreme Court of the United States issued a landmark decision holding that a local school board could be held liable for damages under Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681 et seq. (as amended) for claims of "student-on-student" sexual harassment. *Davis v. Monroe County Board of Education*, 526 U.S. 629, 119 S.Ct. 1661, 143 L.Ed.2d 839 (1999). Such an action will lie "only where the funding recipient acts with deliberate indifference to known acts of harassment in its programs or activities" and "only for harass-

ment that is so severe, pervasive, and objectively offensive that it effectively bars the victim's access to an educational opportunity or benefit." *Id.* at 1666.[1] This case properly may be viewed as the inevitable fallout from that holding, since this action involves a school district's attempt to prevent harassment prior to its occurrence as well as its attempt to set forth a procedure to remedy an instance of harassment.

To be balanced against that effort are an individual's rights under the Bill of Rights, specifically the rights to free speech, free exercise of religion, free press, and due process, and against the establishment of religion. The primary issue in this case may be stated in two ways: Does a school district violate constitutional boundaries by prohibiting harassment?; or, To what extent does the Constitution protect the right to cast verbal stones? [2]

On October 4, 1999, plaintiffs David Warren Saxe, Student Doe 1, and Student Doe 2 commenced this action with the filing of a complaint pursuant to 42 U.S.C. § 1983 alleging that the State College Area School District Anti–Harassment Policy (the "Policy") violates their rights, i.e. the rights enumerated above. They seek a declaration that the Policy is contrary to both the Constitution of the United States and the Pennsylvania Constitution, an injunction against enforcement of the Policy, and costs of this litigation, including attorney's fees.

Before the court are a motion by plaintiffs for a preliminary injunction and a motion by defendants to dismiss the complaint pursuant to Fed.R.Civ.P. 12(b)(6). The motions both will be considered at this time because their disposition depends on the same issues.

*DISCUSSION:*

## I. STATEMENT OF FACTS

Plaintiff David Warren Saxe is an Associate Professor of Education at the Pennsylvania State University and a member of the Pennsylvania State Board of Education. He is a former member of the school board for the State College Area School District (SCASD) and has been an unpaid volunteer for SCASD. Student Doe 1 and Student Doe 2 are enrolled in schools in SCASD. Saxe is the legal guardian of both student-plaintiffs.

Defendant SCASD is a political subdivision of the Commonwealth of Pennsylvania responsible for the administration and operation of the public schools in the State College, Centre County, area. Defendant Constance Martin is the President of the Board of School Directors of SCASD.[3] Other board members are Cynthia Potter (Vice President), Robert Ascah, Eric Barron, Elizabeth Dutton, Lou Ann Evans, Keith Hardin, Donna Queeney, and Susan Werner.

On August 9, 1999, the SCASD board unanimously approved the Policy for the 1999–2000 school year. The Policy has been published on the worldwide web, and SCASD has discussed the Policy in classes and at mandatory student assemblies, and materials on the Policy have been distributed to students. A discussion of the terms of the Policy is set forth below.

Plaintiffs identify themselves as Christians [4] and state that they believe that homosexuality is a sin. Further, they believe that they feel compelled by their religion to "speak out" about the sinful nature and harmful effects of homosexuali-

---

1. Page numbering, except for the first page, is not yet available for the United States Reports version of this case. All page references therefore are to the Supreme Court Reporter.

2. *See John* 8:1–11.

3. Plaintiffs name Martin as President of SCASD. A school district in Pennsylvania does not itself have a president or vice presi-

dent; rather, a school board elects its officers at an organizational meeting. 24 Pa.Stat. Ann. §§ 4–403, 4–404. *See also* 24 Pa.Stat. Ann. §§ 4–426 et seq. (setting forth duties of school board officers).

4. No specific church or denomination among the diverse groups who identify themselves as Christians is recited.

ty and other topics, especially moral issues. Plaintiffs allege that they fear being punished for expressing their religious beliefs, whether verbally, by symbols or acts, or otherwise.

## II. PROVISIONS OF THE POLICY

The Policy is divided into a number of parts, including "General Statement of Policy," "Definitions," "Procedures for Implementation of Anti–Harassment Policy," "Reporting of Potential Physical and/or Sexual Abuse," "Confidentiality," "Alternative Complaint Procedures," "Litigation," and "Notice and Publication." Plaintiffs contend that language specifically defining "harassment" is absent. However, several provisions of the Policy refer to conduct which may constitute harassment, and we set forth those provisions in full.

> Harassment means verbal or physical conduct based on one's actual or perceived race, religion, color, national origin, gender, sexual orientation, disability, or other personal characteristics, and which has the purpose or effect of substantially interfering with a student's educational performance or creating an intimidating, hostile or offensive environment.
>
> According to state law (18 Pa.C.S.A. § 2709), an individual commits the crime of harassment when, with intent to harass, annoy or alarm another person, the individual subjects, or attempts or threatens to subject, the other person to unwelcome physical contact; follows the other person in or about a public place or places; or behaves in a manner which alarms or seriously annoys the other person and which serves no legitimate purpose.
>
> Harassment can include any unwelcome verbal, written or physical conduct which offends, denigrates, or belittles an individual because of any of the characteristics described above. Such conduct includes, but is not limited to unsolicited derogatory remarks, jokes, demeaning comments or behavior, slurs, mimicking, name calling, graffiti, innuendo, gestures, physical contact, stalking, threat-

ening, bullying, extorting or the display or circulation of written materials or pictures.

> It is the policy of the State College Area School District to oppose and prohibit, which qualification harassment based on race, color, religion, national origin, gender, sexual orientation, disability, and other forms of harassment. Harassment is not only a form of discrimination, but also disrespectful behavior which will not be tolerated.
>
> Any harassment of a student by a member of the school community is a violation of this policy.
>
> The State College Area School District shall act to investigate all complaints of harassment, either formal or informal, verbal or written, and will take appropriate action against any member of the school community who is found to have violated this policy.
>
> . . .
>
> Any school employee who observes, overhears, or otherwise witnesses harassment, which may be unlawful, or to whom such harassment is reported, must take prompt and appropriate action to stop the harassment and to prevent its recurrence.
>
> . . .

State College Area School District Anti–Harassment Policy (appended to Complaint as Exhibit A) at 1, 3.

Other important provisions of the Policy include a definition of "school community" as "includ[ing], but is not limited to, all students, school employees, contractors, unpaid volunteers, school board members, and other visitors." *Id.* at 2. A list of specific forms of harassment, including sexual, racial and color, religious, national origin, sexual orientation, disability, and "other," also is provided. *Id.* at 2–3. The procedures for reporting harassment and the actions to be taken by SCASD, through its "harassment complaint officials," are included. *Id.* at 3–5. The Policy also provides notice to the reader that

complaints of harassment may be made to outside agencies and that litigation under both federal and state law may be possible. *Id.* at 6.

Our reading of the Policy leads us to conclude that the provision which is at issue is the second paragraph of the Policy, which is the first paragraph quoted above. This provision breaks "harassment" down into two parts. First, there must be verbal or physical conduct based on actual or perceived physical characteristics. Second, the conduct must be intended to or actually cause substantial interference with a student's school performance, or must create an intimidating, hostile or offensive environment.

Various other provisions describe behavior that may constitute harassment or explain specific types of harassment. It is the definition in the second paragraph of the Policy (again, the first quoted above) which is the focus, however.

### III. ISSUES BEFORE THE COURT

Before undertaking our legal analysis, we think it important to limit the issues before the court. The parties have chosen to expend considerable effort to characterize their opponents and their opponents' positions in a negative light, thereby wandering far afield from what is actually material to our disposition of the pending motions. Defendants, for example, repeatedly remind the court of plaintiffs' purported homophobia, while plaintiffs inject unnecessary and inapt allusions to Humpty Dumpty.[5] None of this, of course, is useful for determining whether the Policy is within constitutional parameters.

In moving to dismiss, defendants first assert that plaintiffs lack standing to bring this action. Alternatively, they argue that the Policy is beyond constitutional re-

proach. We will address these questions in turn.

### IV. STANDARD: MOTION TO DISMISS

A motion to dismiss under Fed.R.Civ.P. 12(b)(6) admits the well pleaded allegations of the complaint, but denies their legal sufficiency. *Hospital Building Co. v. Trustees of the Rex Hospital,* 425 U.S. 738, 740, 96 S.Ct. 1848, 48 L.Ed.2d 338 (1976). The complaint must be construed in favor of the plaintiff with every doubt resolved in the plaintiff's favor. *In re Arthur Treacher's Franchise Litigation,* 92 F.R.D. 398, 422 (E.D.Pa.1981). That is, the court must accept as true all factual allegations set forth in the complaint as well as all reasonable inferences that can be drawn from them. *Nami v. Fauver,* 82 F.3d 63, 65 (3d Cir.1996); *Jordan v. Fox, Rothschild, O'Brien & Frankel,* 20 F.3d 1250, 1261 (3d Cir.1994). The court looks only to the facts alleged in the complaint and any attachments, without reference to any other parts of the record. *Jordan* at 1261. "[A] case should not be dismissed unless it clearly appears that no relief can be granted under any set of facts that could be proved consistently with the plaintiff's allegations." *Id.* (citing, *inter alia, Hishon v. King & Spalding,* 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984)). Whether a plaintiff will ultimately prevail is not a consideration for review of a motion under Rule 12(b)(6). *Nami* at 65.

### V. STANDING

Defendants properly assert that the overbreadth doctrine, as invoked by plaintiffs, is not applicable in this case. That does not mean, however, that plaintiffs lack standing.

██ The overbreadth doctrine is an exception to conventional standing require-

5. The parties understandably are dedicated to the positions they have taken, plaintiffs due to their religious beliefs and defendants as educators. A legal brief, however, is not a soapbox for espousing the social and political

views of a party. It would be much more helpful if the parties would confine themselves to legal issues rather than launching verbal broadsides.

ments, *Waterman v. Farmer*, 183 F.3d 208, 212 n. 5 (3d Cir.1999), under which a plaintiff must show an actual or imminent injury. *ACLU v. Reno*, 31 F.Supp.2d 473, 479 (E.D.Pa.1999). A person whose own speech or expressive conduct is subject to a valid prohibition or sanction may bring an action challenging the statute (or, as in this case, policy) on its face because it also threatens others not before the court who desire to engage in protected speech but who may refrain from doing so rather than risk sanction. *Brockett v. Spokane Arcades, Inc.*, 472 U.S. 491, 503, 105 S.Ct. 2794, 86 L.Ed.2d 394 (1985).

> It is otherwise where the parties challenging the statute are those who desire to engage in protected speech that the overbroad statute purports to punish, or who seek to publish both protected and unprotected material. There is then no want of a proper party to challenge the statute, no concern that an attack on the statute will be unduly delayed or protected speech discouraged. The statute may forthwith be declared invalid to the extent that it reaches too far, but otherwise left intact.

*Brockett* at 504, 105 S.Ct. 2794.

■ In this instance, plaintiffs claim that they wish to engage in speech protected by the First Amendment and that their speech has been chilled by the Policy. They thus have standing absent application of the overbreadth doctrine. *Cf. ACLU v. Reno* at 481 (plaintiffs challenging statute on First Amendment grounds had standing when they showed credible threat of prosecution or that they would imminently suffer injury).

### VI. DEFINING HARASSMENT

■ Regardless of the amendment, or the clause of the First Amendment, under which plaintiffs bring their claims, the validity of the claims depends on whether defendants have defined "harassment" sufficiently within the Policy, because it is "harassment" which the Policy purports to prohibit.

Defendants argue that the Policy sufficiently defines "harassment" when read as a whole, and that plaintiffs' cramped reading of a single provision of the Policy is not the entirety of the definition provided. We agree.

Plaintiffs focus on the third paragraph of the Policy quoted above, that which begins with "Harassment can include ..." As discussed, however, the first-quoted paragraph is more properly read as embodying the definition, with the following paragraphs simply adding examples of what conduct might fall within the definition. The first paragraph states that harassment is language or conduct which is based on specified characteristics and which has the effect of "substantially interfering with a student's educational performance" or which creates a hostile educational atmosphere. As defendants point out, this language is familiar to any practitioner of employment or education discrimination law as that used by courts and agencies to define harassment for purposes of Title VII, Title IX, the Pennsylvania Human Relations Act, etc.

We also must agree with defendants that a more precise definition of harassment, like Justice Stewart's famous description of "pornography,"[6] may be virtually impossible. As Justice O'Connor pointed out in *Davis:*

> Whether gender-oriented conduct rises to the level of actionable "harassment" thus "depends on a constellation of surrounding circumstances, expectations, and relationships," *Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75, 82, 118 S.Ct. 998, 140 L.Ed.2d 201

---

6. Referring to "hard-core pornography," Justice Stewart said, "I shall not today attempt further to define the kinds of material I understand to be embraced within that shorthand description; and perhaps I could never succeed in intelligibly doing so. But I know it when I see it, and the motion picture involved in this case is not that." *Jacobellis v. Ohio*, 378 U.S. 184, 197, 84 S.Ct. 1676, 12 L.Ed.2d 793 (1964) (Stewart, J., concurring). The quotation usually is shortened to "I know it when I see it."

(1998), including, but not limited to, the ages of the harasser and the victim and the number of individuals involved, *see* OCR Title IX Guidelines 12041–12042. . . .

*Davis,* at 1675. Thus, some flexibility is to be expected.

Defendants assert that the definition of harassment which they have provided, as well as the definitions of the various forms of harassment such as sexual harassment, etc., reflect definitions used by courts and agencies which have been asked to interpret the various laws on employment and educational discrimination. Obviously, providing a detailed explanation derived from statutes, regulations, and case law would not be helpful to most schoolchildren, as such material is incomprehensible to most adults (including at times many judges and lawyers).

There is one further point, however, that we believe seals the outcome of this case. It might be noted in reading the passages from the Policy that we have quoted above that the last passage, that of the requirement that school employees take action when harassment comes to their attention, differs from the remaining passages quoted in that it is not a definition or description of harassment or conduct which may constitute harassment. We have included this passage for a very specific reason: It states that an employee must take action when the harassment may be *unlawful.*

In other words, SCASD is not prohibiting anything that is not already prohibited by law. That law takes the form of Pennsylvania's criminal harassment statute

(paraphrased in the Policy),[7] Title VII, Title IX, the Americans with Disabilities Act, the Pennsylvania Human Relations Act, etc. Apart from the definitions, descriptions, and examples of harassment set forth in the Policy, this reading is supported by reference to page 6 of the Policy. There, the reader is informed that, in addition to or in lieu of the procedure contained in the Policy, complaints of harassment also may be filed with the Pennsylvania Human Relations Commission, the Pennsylvania Department of Education, and the Office for Civil Rights of the U.S. Department of Education. Those agencies investigate complaints of alleged *unlawful* discrimination.[8]

The Policy, then, is subject to a limiting construction (if such is necessary) which plainly makes it valid. *See Broadrick v. Oklahoma,* 413 U.S. 601, 613, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973) (statute does not violate First Amendment when it is subject to construction which makes it permissible); *United States v. Waymer,* 55 F.3d 564, 569 (11th Cir.1995) (same), *cert. denied,* 517 U.S. 1119, 116 S.Ct. 1350, 134 L.Ed.2d 519 (1996).

Plaintiffs characterize the Policy as a hate-speech code, a type of regulation which has been the subject of considerable discussion and debate in recent years due to their plainly overreaching effects. Indeed, one's initial reaction to a description of the Policy is in line with that characterization: The Policy must be wrong because it attempts to place a limit on free speech. In our sound-bite-driven society, however, one must take special care that a cursory

---

**7.** *Defendants argue that the Policy definition cannot be found to be lacking because this statute has withstood constitutional* challenge. *See generally Commonwealth v. Miller,* 455 Pa.Super. 534, 689 A.2d 238 (1997), *allocatur denied,* 548 Pa. 646, 695 A.2d 785 (1997) (table). One element missing from the definition as it relates to behavior which "alarms or seriously annoys [an]other person" is that the behavior must be part of a "course of conduct." 18 Pa.Cons.Stat.Ann. § 2709(a)(3). "Course of conduct" is defined as a "pattern of actions composed of more than one act over a period of time, however short, evidenc-

ing a continuity of conduct." 18 Pa.Cons. Stat.Ann. § 2709(f). Because the statute is used merely as an example of conduct which may constitute harassment, and the preceding paragraph of the Policy defines harassment, the omission is not material to our disposition of the instant motions.

**8.** In civil rights law, harassment based on designated personal attributes is a form of discrimination. *See generally Davis,* at 1674 ("sexual harassment is a form of discrimination for Title IX purposes").

description is not taken at face value and the matter is considered somewhat more thoroughly.

In this instance, as defendants recite, the Policy is not a hate-speech code; it prohibits harassment. Harassment has never been considered to be protected activity under the First Amendment. In fact, the harassment prohibited under the Policy already is unlawful. The Policy is a tool which gives SCASD the ability to take action itself against harassment which may subject it to civil liability.

Because the Policy is constitutionally sound, the complaint is subject to dismissal.

### VII. PRELIMINARY INJUNCTION

Fed.R.Civ.P. 65 provides for the issuance of preliminary injunctions. In this Circuit,

> At the trial level, the party seeking a preliminary injunction bears the burden of producing evidence sufficient to convince the court that (1) the movant has shown a reasonable probability of success on the merits; (2) the movant will be irreparably injured by denial of relief; (3) granting preliminary relief will not result in even greater harm to the other party; and (4) granting preliminary relief will be in the public interest. . . .

*ECRI v. McGraw–Hill, Inc.,* 809 F.2d 223, 226 (3d Cir.1987) (citation omitted). *See also Schulz v. U.S. Boxing Ass'n,* 105 F.3d 127, 131 n. 6 (3d Cir.1997).

The requirement of a reasonable probability of success on the merits also has been described as a "better than negligible chance" of success on the merits. *Int'l Kennel Club v. Mighty Star, Inc.,* 846 F.2d 1079, 1084 (7th Cir.1988) (citations omitted). Regarding the element of irreparable injury, the harm must be imminent and of such a nature that money damages alone

cannot atone for it. *ECRI,* 809 F.2d at 226.

Since we have found that the Policy is not unconstitutional on its face, plaintiffs have not shown a reasonable likelihood of success on the merits, and the motion for a preliminary injunction will be denied.

### VIII. CONCLUSION

We conclude that the Policy properly defines "harassment" as conduct based on a person's physical characteristics which substantially affects school performance or creates a hostile atmosphere. In addition, the Policy adds a gloss that the type of "harassment" which is prohibited is that which already is prohibited by law. The Policy simply gives school officials the ability to take action against unlawful harassment by or against persons subject to their authority. Regardless of the specific constitutional provision on which plaintiffs choose to rely, the Policy does not violate the Constitution of the United States.[9]

We do not mean to imply that, in certain instances, the manner in which the Policy is enforced may not have the effect of infringing on constitutionally protected liberties. Our holding is limited to a conclusion that the Policy itself does not have that effect.

Plaintiffs' motion for preliminary injunctive relief will be denied, and defendants' motion to dismiss will be granted. An order consistent with this memorandum will issue.

---

9. The parties generally confine their arguments to the federal Constitution. Since the provisions of the Pennsylvania Constitution at issue generally comport with the U.S. Constitution, and because the sources of state law on which the Policy is based in part have been found to be consistent with the state Constitution, we reach the same conclusion with respect to the state Constitution.