

2001 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

2-14-2001

# Saxe v. State College Area High School

Precedential or Non-Precedential:

Docket 99-4081

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2001

Recommended Citation

"Saxe v. State College Area High School" (2001). *2001 Decisions.* Paper 27.
http://digitalcommons.law.villanova.edu/thirdcircuit_2001/27

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2001 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed February 14, 2001

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 99-4081

DAVID WARREN SAXE; STUDENT DOE 1, by and through
his next friend, DAVID WARREN SAXE; STUDENT DOE 2,
by and through his next friend, DAVID W ARREN SAXE,
        Appellants

v.

STATE COLLEGE AREA SCHOOL DISTRICT;
CONSTANCE MARTIN, in her official capacity as
President of the State College Area School District

ON APPEAL FROM THE
UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF PENNSYLVANIA

(Dist. Court No. 99-cv-01757)
District Court Judge: James F. McClur e, Jr.

Argued: May 23, 2000

Before: ALITO, RENDELL, and DUHE,* Cir cuit Judges.

(Opinion Filed: February 14, 2001)

_____
* The Honorable John M. Duhe, Jr., Senior Judge of the United States
Court of Appeals for the Fifth Circuit, sitting by designation.

BRYAN J. BROWN (Argued)
STEPHEN M. CRAMPTON
BRIAN FAHLING
MICHAEL J. DEPRIMO
AFA Center for Law and Policy
P.O. Box 2440
100 Parkgate Drive, Suite 2-B
Tupelo, MS 38803

SCOTT WILLIAMS
P.O. Box 3
57 East 4th Street
Williamsport, PA 17701

  Counsel for Appellants

JOHN R. MILLER, JR.
DAVID B. CONSIGLIO (Argued)
Miller, Kistler, Campbell, Miller ,
 Williams & Benson, Inc.
720 South Atherton Street
State College, PA 16801

  Counsel for Appellees

OPINION OF THE COURT

ALITO, Circuit Judge:

The plaintiffs in this case challenge the constitutionality of a public school district's "anti-harassment" policy, arguing that it violates the First Amendment's guarantee of freedom of speech.1 The District Court, concluding that the policy prohibited no more speech than was already unlawful under federal and state anti-discrimination laws, held that the policy is constitutional and enter ed judgment for the school district. We reverse.

_____

1. Plaintiffs also assert that the Policy violates the free speech guarantee
of the Pennsylvania Constitution. However, plaintiffs fail to present any authority to show that Pennsylvania's guarantees ar e any broader than the First Amendment's. Accordingly, we confine our discussion to the plaintiffs' federal constitutional claims.

I.

A.

In August 1999, the State College Area School District ("SCASD") adopted an Anti-Harassment Policy ("the Policy"). The full text of the Policy is reproduced in the Appendix to this opinion; we will briefly review the most relevant portions here.

The Policy begins by setting forth its goal--"providing all students with a safe, secure, and nurturing school environment"--and noting that "[d]isr espect among members of the school community is unacceptable behavior which threatens to disrupt the school envir onment and well being of the individual." The second paragraph contains what appears to be the Policy's operative definition of harassment:

> Harassment means verbal or physical conduct based on one's actual or perceived race, religion, color, national origin, gender, sexual orientation, disability, or other personal characteristics, and which has the purpose or effect of substantially inter fering with a student's educational performance or cr eating an intimidating, hostile or offensive envir onment.

The Policy continues by providing several examples of "harassment":

> Harassment can include any unwelcome verbal, written or physical conduct which offends, denigrates or belittles an individual because of any of the characteristics described above. Such conduct includes, but is not limited to, unsolicited der ogatory remarks, jokes, demeaning comments or behaviors, slurs, mimicking, name calling, graffiti, innuendo, gestures, physical contact, stalking, thr eatening, bullying, extorting or the display or circulation of written material or pictures.

These examples are followed by a lengthy section captioned "Definitions," which defines various types of prohibited harassment, including "Sexual harassment," "Racial and color harassment," "Harassment on the basis of

3

religion," "Harassment based on national origin," "Disability harassment," and "Other harassment" on the basis of characteristics such as "clothing, physical appearance, social skills, peer group, intellect, educational program, hobbies or values, etc." The definitions state that harassment "can include unwelcome verbal, written or physical conduct directed at" the particular characteristic. Examples of specific types of harassment ar e also provided. For example, "Racial and color harassment" is said to include "nicknames emphasizing stereotypes, racial slurs, comments on manner of speaking, and negative r eferences to racial customs." Religous harassment r eaches "derogatory comments regarding sur names, religious tradition, or religious clothing, or religious slurs or graffiti." National origins harassment includes "negative comments regarding surnames, manner of speaking, customs, language, or ethnic slurs." Harassment on the basis of sexual orientation extends to "negative name calling and degrading behavior." Disability harassment encompasses "imitating manner of speech or movement."

The Policy provides that "[a]ny harassment of a student by a member of the school community is a violation of this policy."2 It establishes pr ocedures for the reporting, informal mediation, and formal r esolution of complaints. In addition, the Policy sets a list of punishments for harassment, "including but not limited to war ning, exclusion, suspension, expulsion, transfer, termination, discharge . . ., training, education, or counseling."

B.

Plaintiff David Saxe is a member of the Pennsylvania State Board of Education and serves as an unpaid volunteer for SCASD. He is the legal guardian of both student-plaintiffs, who are enrolled in SCASD schools. After

_____

2. The school community, by the Policy's ter ms, "includes, but is not limited to, all students, school employees, contractors, unpaid volunteers, school board members, and other visitors." "School employees" include, but are not limited to,"all teachers, support staff, administrators, bus drivers, custodians, cafeteria workers, coaches, volunteers, and agents of the school."

4

the Anti-Harassment Policy was adopted, Saxe filed suit in District Court, alleging that the Policy was facially unconstitutional under the First Amendment's fr ee speech clause.3 In his Complaint, he alleged that

> [a]ll Plaintiffs openly and sincer ely identify themselves as Christians. They believe, and their religion teaches, that homosexuality is a sin. Plaintiffs further believe that they have a right to speak out about the sinful nature and harmful effects of homosexuality. Plaintiffs also feel compelled by their religion to speak out on other topics, especially moral issues.

(App. 27.) Plaintiffs further alleged that they feared that they were likely to be punished under the Policy for speaking out about their religious beliefs, engaging in symbolic activities reflecting those beliefs, and distributing religious literature. (App. 27-28.) They sought to have the Policy declared unconstitutionally vague and overbroad and its operation permanently enjoined.

The District Court found that Saxe had standing to mount a facial challenge but granted SCASD's motion to dismiss on the pleadings, holding that the Policy was facially constitutional. See Saxe v. State College Area School District, 77 F. Supp. 2d 621 (M.D. Pa. 1999). The Court found that the Policy's operative definition of harassment was contained in its second paragraph, which, as the Court read it, prohibited "language or conduct which is based on specified characteristics and which has the ef fect of `substantially interfering with a student's educational performance' or which creates a hostile educational atmosphere." Id. at 625. The Court went on to observe that this standard is similar to "that used by courts and agencies to define harassment for purposes of T itle VII, Title IX, the Pennsylvania Human Relations Act, etc." Id. Consequently, the Court held that the Policy does not prohibit "anything that is not already prohibited by law" and therefore cannot be unconstitutional. Id. at 626. Rejecting the plaintiffs' vagueness ar gument, the Court

---

3. In their complaint, plaintiffs also asserted a claim under the free exercise clause of the First Amendment, but they do not press this claim on appeal.

5

asserted that "a more precise definition of harassment, like Justice Stewart's famous description of `por nography,' may be virtually impossible." Id. at 625. Plaintiffs appealed.

II.

The District Court dismissed the plaintiffs' free speech claims based on its conclusion that "harassment," as defined by federal and state anti-discrimination statutes, is not entitled to First Amendment protection. The Court rejected the plaintiffs' characterization of the Policy as a "hate speech code," holding instead that it merely prohibits harassment that is already unlawful under state and federal law. The Court observed:

> Harassment has never been considered to be pr otected activity under the First Amendment. In fact, the harassment prohibited under the Policy alr eady is unlawful. The Policy is a tool which gives SCASD the ability to take action itself against harassment which may subject it to civil liability.

Saxe, 77 F. Supp. 2d at 627.

We disagree with the District Court's r easoning. There is no categorical "harassment exception" to the First Amendment's free speech clause. Moreover , the SCASD Policy prohibits a substantial amount of speech that would not constitute actionable harassment under either federal or state law.

A.

Because the District Court based its holding on a determination that the Policy simply r eplicated existing law, we begin by briefly reviewing the scope of the applicable anti-harassment statutes. At the federal level, discriminatory harassment in the public schools is governed primarily by two statutes. Title VI of the Civil Rights Act of 1964 provides that "[n]o person in the United States shall, on the ground of race, color , or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any pr ogram or activity receiving Federal financial assistance." 42 U.S.C.

6

S 2000d. Title IX of the Education Amendments of 1972 further provides that "[n]o person . . . shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any educational program or activity receiving federal financial assistance." 20 U.S.C. S 1681(a). Although less often involved in harassment cases, the Rehabilitation Act of 1973, 29 U.S.C. S 794, makes it unlawful for programs receiving federal assistance to discriminate on the basis of disability or age.[4]

The federal courts have held that these statutes cr eate a private right of action similar to that available under Title VII, which prohibits discrimination in the workplace. Most significantly for this case, the Supreme Court has recognized that a public school student may bring suit against a school under Title IX for so-called"hostile environment" harassment. Davis v. Monr oe County Board of Education, 526 U.S. 629 (1999); Franklin v. Gwinnett County Pub. Schs., 503 U.S. 60, 74-75 (1992).

The concept of "hostile environment" harassment originated in a series of Title VII cases involving sexual harassment in the workplace. In Meritor Savings Bank v. Vinson, 477 U.S. 57 (1986), the Supr eme Court held that Title VII prohibits abusive and discriminatory conduct that creates a "hostile environment"--that is, harassment so

_____

4. The District Court also referred to two state statutes: the Pennsylvania
Human Relations Act (PHRA) and the Pennsylvania criminal harassment statute. We do not believe that either of these statutes is particularly relevant to this appeal. The PHRA, 43 P .S.A. SS 951 et seq., prohibits discrimination in employment, housing and public accommodations on the basis of "race, color, religious creed, ancestry, age, sex, national origin or non-job related handicap or disability." 43 P.S.A. S 953. It has not been construed, however, to create a cause of action for "hostile environment" harassment of a public school student. Pennsylvania's criminal harassment statute makes it a criminal of fense when a person, with intent to harass, annoy or alarm another person, subjects or threatens to subject that person to unwelcome physical contact; follows that person in or about a public place; or behaves in a manner which alarms or seriously annoys that person and that serves no legitimate purpose. 18 P.S.A. S 2709. Clearly, this law covers a much narrower range of conduct than is implicated by the SCASD Policy.

7

severe or pervasive as "to alter the conditions of the victim's employment and create an abusive working envir onment." Id. at 67. In Harris v. Forklift Systems, Inc., 510 U.S. 17 (1993), the Court clarified that in order for conduct to constitute harassment under a "hostile envir onment" theory, it must both: (1) be viewed subjectively as harassment by the victim and (2) be objectively severe or pervasive enough that a reasonable person would agree that it is harassment. See id. at 21-22. The Court emphasized that the objective prong of this inquiry must be evaluated by looking at the "totality of the cir cumstances." "These may include," the Court observed, "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mer e offensive utterance; and whether it unreasonably inter feres with an employee's work performance." Id . at 23. See also Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 80 (1998) ("Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work envir onment--an environment that a reasonable person wouldfind hostile or abusive--is beyond Title VII's purview."). In defining the contours of this concept, the Court has repeatedly stated that Title VII is not violated by the "mer e utterance of an . . . epithet which engenders offensive feelings in an employee" or by mere " `discourtesy or rudeness,' unless so severe or pervasive as to constitute an objective change in the conditions of employment." Faragher v. City of Boca Raton, 524 U.S. 775, 787 (1998).

The Supreme Court has extended an analogous cause of action to students under Title IX. Originally, such claims were limited to cases involving harassment of a student by a teacher or other agent of the school. See Franklin v. Gwinnett County Pub. Schs., supra. However, in 1999, in Davis v. Monroe County Board of Education, supra, the Court held that Title IX also permits a plaintiff to recover damages from a federally funded educational institution for certain cases of student-on-student sexual harassment. To recover in such a case,

> a plaintiff must establish sexual harassment of students that is so severe, pervasive, and objectively offensive, and that so undermines and detracts from

8

the victims' educational experience, that the victim-
students are effectively denied equal access to an
institution's resources and opportunities.

Id. at 651. This determination " `depends on a constellation
of surrounding circumstances, expectations, and
relationships,' including, but not limited to, the ages of the
harasser and the victim, and the number of individuals
involved." Id. (quoting Oncale, 523 U.S. at 82). The Court
stressed that "[d]amages are not available for simple acts of
teasing and name-calling among school childr en, even
where these comments target differ ences in gender." Id. at
652. Rather, private damages actions against the school are
limited to cases is which the school "acts with deliberate
indifference to known acts of harassment," and those acts
have "a systemic effect on educational pr ograms and
activities." Id. at 633, 653.5

B.

With this framework in mind, we now tur n to the District
Court's assertion that "harassment has never been
considered to be protected activity under the First
Amendment." The District Court's categorical
pronouncement exaggerates the current state of the case
law in this area.

There is of course no question that non-expr essive,
physically harassing conduct is entir ely outside the ambit of
the free speech clause. But there is also no question that
the free speech clause protects a wide variety of speech that
listeners may consider deeply offensive, including
statements that impugn another's race or national origin or
that denigrate religious beliefs. See, e.g., Brandenburg v.
Ohio, 395 U.S. 444 (1969); Cantwell v. Connecticut, 310
U.S. 296 (1940). When laws against harassment attempt to

_____

5. Although both Franklin and Davis  dealt with sexual harassment under
Title IX, we believe that their reasoning applies equally to harassment on
the basis of the personal characteristics enumerated in Title VI and
other relevant federal anti-discrimination statutes. Accord Monteiro v.
Tempe Union High Sch. Dist., 158 F .3d 1022, 1032-33 (9th Cir. 1998)
(applying Title VI to student-on-student racial harassment).

regulate oral or written expression on such topics, however detestable the views expressed may be, we cannot turn a blind eye to the First Amendment implications. "Where pure expression is involved," anti-discrimination law "steers into the territory of the First Amendment." DeAngelis v. El Paso Mun. Police Officers' Ass'n, 51 F.3d 591, 596 (5th Cir. 1995).

This is especially true because, as the Fifth Cir cuit has noted, when anti-discrimination laws are "applied to . . . harassment claims founded solely on verbal insults, pictorial or literary matter, the statute[s] impose[ ] content-based, viewpoint-discriminatory restrictions on speech." DeAngelis, 51 F.3d at 596-97. Indeed, a disparaging comment directed at an individual's sex, race, or some other personal characteristic has the potential to create an "hostile environment"--and thus come within the ambit of anti-discrimination laws--precisely because of its sensitive subject matter and because of the odious viewpoint it expresses.6

This sort of content- or viewpoint-based restriction is ordinarily subject to the most exacting First Amendment scrutiny. This point was dramatically illustrated in R.A.V. v. City of St. Paul, 505 U.S. 377 (1992), in which the Supreme

_____

6. Most commentators including those who favor and oppose First Amendment protection for harassing speech, agr ee that federal anti-discrimination law regulates speech on the basis of content and viewpoint. See, e.g., Deborah Epstein, Can a "Dumb Ass Woman" Achieve Equality in the Workplace? Running the Gauntlet of Hostile Environment Harassing Speech, 84 Geo. L.J. 399, 433 (1996); Eugene Volokh, How Harassment Law Restricts Free Speech, 47 Rutgers L. Rev. 563, 571-72 (1995); Suzanne Sangree, Title VII Pr ohibitions Against Hostile Environment Sexual Harassment and the First Amendment: No Collision in Sight, 47 Rutgers L. Rev. 461, 477 (1995); Richard H. Fallon, Sexual Harassment, Content Neutrality, and the First Amendment Dog That Didn't Bark, 1994 Sup. Ct. L. Rev. 1, 8 (1994); Kingsley R. Browne, Title VII as Censorship: Hostile-Environment Harassment and the First Amendment, 52 Ohio State L.J. 481, 481 (1991); Marcy Strauss, Sexist Speech in the Workplace, 25 Harv. C.R.-C.L. L. Rev. 1, 32-33 (1990). But see Charles R. Calleros, Title VII and the First Amendment: Content-Neutral Regulation, Disparate Impact, and the "Reasonable Person", 58 Ohio St. L.J. 1217 (1997).

Court struck down a municipal hate-speech ordinance prohibiting "fighting words" that aroused "anger, alarm or resentment on the basis of race, color, creed, religion or gender." Id. at 377. While recognizing that fighting words generally are unprotected by the First Amendment, the Court nevertheless found that the ordinance unconstitutionally discriminated on the basis of content and viewpoint:

> Displays containing some words--odious racial epithets, for example--would be prohibited to proponents of all views. But "fighting words" that do not themselves invoke race, color, creed, religion, or gender--aspersions upon a person's mother, for example--would seemingly be usable ad libitum in the placards of those arguing in favor of racial, color, etc. tolerance and equality, but could not be used by that speaker's opponents.

Id. at 391. Striking down the law, the Court concluded that "[t]he point of the First Amendment is that majority preferences must be expressed in some fashion other than silencing speech on the basis of content." Id . at 392.

Loosely worded anti-harassment laws may pose some of the same problems as the St. Paul hate speech ordinance: they may regulate deeply offensive and potentially disruptive categories of speech based, at least in part, on subject matter and viewpoint. Although the Supreme Court has written extensively on the scope of workplace harassment, it has never squarely addressed whether harassment, when it takes the form of pure speech, is exempt from First Amendment protection. See Weller v. Citation Oil & Gas Corp., 84 F.3d 191, 194 n.6 (5th Cir. 1996) (noting that the Supreme Court has "provid[ed] little guidance whether conduct targeted for its expressive content . . . may be regulated under Title VII"); Aguilar v. Avis Rent A Car Sys., Inc., 980 P.2d 846, 863 (Cal. 1999) (Werdegar, J., concurring) ("No decision by the United States Supreme Court has, as yet, declared that the First Amendment permits restrictions on speech creating a hostile work environment.").7

_____

7. Hishon v. King & Spalding, 467 U.S. 69 (1984), which SCASD cites for the proposition that Title VII's prohibitions do not offend the First

SCASD relies heavily on a passage in R.A.V . in which the Court suggested in dictum that at least some harassing speech does not warrant First Amendment protection:

> [S]ince words in some circumstances violate laws directed not against speech but against conduct (a law against treason, for example, is violated by telling the enemy the nation's defense secrets) a particular content–based subcategory of a proscribable class of speech can be swept up incidentally within the r each of a statute directed at conduct rather than speech [citing Barnes v. Glen Theatre, Inc., 501 U.S. 560, 571 (1991); FTC v. Superior Court Trial Lawyers Assn., 493 U.S. 411, 425–432 (1990); and United States v. O'Brien, 391 U.S. 367, 376–377 (1968)]. Thus, for example, sexually derogatory "fighting words," among other words, may produce a violation of Title VII's general prohibition against sexual discrimination in employment practices. Where the government does not tar get conduct on the basis of its expressive content, acts ar e not shielded from regulation merely because they express a discriminatory idea or philosophy.

R.A.V., 505 U.S. at 389 (other citations omitted) (emphasis added).

This passage suggests that government may constitutionally prohibit speech whose non–expressive qualities promote discrimination. For example, a supervisor's statement "sleep with me or you'r e fired" may be proscribed not on the ground of any expressive idea that the statement communicates, but rather because it facilitates the threat of discriminatory conduct. Despite the purely verbal quality of such a threat, it surely is no more "speech" for First Amendment purposes than the robber's demand "your money or your life." Accor d NLRB v. Gissel Packing Co., 395 U.S. 575, 617, 618 (1969) (holding that employer's "threat of retaliation" on basis of union

_____

Amendment, is inapposite. Hishon, which was decided years before the Supreme Court even recognized the existence of a "hostile environment" cause of action under that statute, only addr essed the constitutionality of the statute's application to quid pro quo harassment.

12

membership was "without the protection of the First
Amendment") (citation and internal quotation marks
omitted).8 Similarly, we see no constitutional problem with

_____

8. The cases cited in R.A.V. each upheld a restriction on expressive
conduct that was based solely on secondary ef fects of the speech that
were merely incidental to its expr essive content. In none of these cases,
however, did the Court imply that the gover nment may prohibit speech
based on a desire to suppress the ideas it communicates. In Barnes, the
Court found that the state's legitimate inter est in preventing public
nudity permitted it to enforce a public indecency statute against a nude
dancing establishment:

> [W]e do not think that when Indiana applies its statute to the nude
> dancing in these nightclubs it is proscribing nudity because of the
> erotic message conveyed by the dancers. . . . The perceived evil
that
> Indiana seeks to address is not erotic dancing, but public nudity.
> The appearance of people of all shapes, sizes and ages in the nude
> at a beach, for example, would convey little if any erotic message,
> yet the State still seeks to prevent it. Public nudity is the evil
the
> State seeks to prevent, whether or not it is combined with
expressive
> activity.

Barnes, 501 U.S. at 570. Similarly, in Supreme Court Trial Lawyers, the
Court upheld, against First Amendment challenge, the application of the
Sherman Act against boycotters based on the boycott's economic effects:

> A nonviolent and totally voluntary boycott may have a disruptive
> effect on local economic conditions. This Court has recognized the
> strong governmental interest in certain forms of economic
> regulation, even though such regulation may have an incidental
> effect on rights of speech and association.

Supreme Court Trial Lawyers, 493 U.S. at 428 n.12 (quoting NAACP v.
Claiborne Hardware Co., 458 U.S. 886, 912 (1982)). Finally, in O'Brien,
the Court found no First Amendment impediment to pr osecuting anti-
war protestors who had violated federal law by burning their draft cards:

> [E]ven on the assumption that the alleged communicative element in
> O'Brien's conduct is sufficient to bring into play the First
> Amendment, it does not necessarily follow that the destruction of a
> registration certificate is constitutionally protected activity. .
. . The
> many functions performed by Selective Service certificates
establish
> beyond doubt that Congress has a legitimate and substantial
> interest in preventing their wanton and unrestrained destruction
> and assuring their continuing availability by punishing people who

> knowingly and wilfully destroy or mutilate them.

O'Brien, 391 U.S. at 376, 380. Accor d Wisconsin v. Mitchell, 508 U.S. 467, 487–88 (1993) (noting that conduct not tar geted on the basis of its expressive content may be regulated under Title VII).

13

using an employer's offensive speech as evidence of motive or intent in a case involving an allegedly discriminatory employment action. Accord Dawson v. Delaware, 503 U.S. 159 (1992) ("The Constitution does not er ect a per se barrier to the admission of evidence concerning one's beliefs and associations . . . simply because those beliefs and associations are protected by the First Amendment.").

The previously quoted passage from R.A.V., however, does not necessarily mean that anti-discrimination laws are categorically immune from First Amendment challenge when they are applied to prohibit speech solely on the basis of its expressive content. See DeAngelis, 51 F.3d at 596 n.7; John E. Nowak & Ronald D. Rotunda, Constitutional Law S 16.39, at 1116 (5th ed. 1995). "Harassing" or discriminatory speech, although evil and offensive, may be used to communicate ideas or emotions that nevertheless implicate First Amendment protections. As the Supreme Court has emphatically declared, "[i]f there is a bedrock principle underlying the First Amendment, it is that the government may not prohibit the expr ession of an idea simply because society finds the idea offensive or disagreeable." Texas v. Johnson , 491 U.S. 397, 414 (1989).

For this reason, we cannot accept SCASD's contention that the application of anti-harassment law to expr essive speech can be justified as a regulation of the speech's "secondary effects." R.A.V.  did acknowledge that content-discriminatory speech restrictions may be per missible when the content classification merely "happens to be associated with particular `secondary effects' of the speech, so that the regulation is `justified without r eference to the content of the . . . speech.' " R.A.V., 505 U.S. at 389 (quoting Renton v. Playtime Theatres, Inc., 475 U.S. 41, 48 (1986)). The Supreme Court has made it clear, however , that the government may not prohibit speech under a "secondary effects" rationale based solely on the emotive impact that its offensive content may have on a listener:"Listeners' reactions to speech are not the type of`secondary effects' we referred to in Renton. . . . The emotive impact of speech on its audience is not a `secondary effect.' " Boos v. Barry, 485 U.S. 312, 321 (1988); see also United States v. Playboy Entertainment Group, 120 S. Ct. 1878, 1885 (2000) ("The

14

overriding justification for the regulation is concern for the effect of the subject matter on [listeners] . . . . This is the essence of content-based regulation."); Forsyth County v. Nationalist Movement, 505 U.S. 123, 134 (1992) ("Listeners' reaction to speech is not a content-neutral basis for regulation."). Nor do we believe that the r estriction of expressive speech on the basis of its content may be characterized as a mere "time, place and manner" regulation. See Reno v. ACLU, 521 U.S. 844, 879 (1997) ("time, place and manner" analysis not applicable when statute "regulates speech on the basis of its content"); Pacific Gas & Elec. Co. v. Public Util. Comm'n, 475 U.S. 1, 20 (1986) ("[f]or a time, place, or manner r egulation to be valid, it must be neutral as to the content of the speech"); Consolidated Edison Co. v. Public Serv. Comm'n, 447 U.S. 530, 536 (1980) ("a constitutionally permissible time, place, or manner restriction may not be based upon either the content or subject matter of speech").

In short, we see little basis for the District Court's sweeping assertion that "harassment"--at least when it consists of speech targeted solely on the basis of its expressive content--"has never been considered to be protected activity under the First Amendment." Such a categorical rule is without precedent in the decisions of the Supreme Court or this Court, and it belies the very real tension between anti-harassment laws and the Constitution's guarantee of freedom of speech.

We do not suggest, of course, that no application of anti-harassment law to expressive speech can survive First Amendment scrutiny. Certainly, preventing discrimination in the workplace--and in the schools--is not only a legitimate, but a compelling, government inter est. See, e.g., Board of Directors of Rotary Int'l v. Rotary Club of Duarte, 481 U.S. 537, 549 (1987). And, as some courts and commentators have suggested, speech may be mor e readily subject to restrictions when a school or workplace audience is "captive" and cannot avoid the objectionable speech. See, e.g., Aguilar, 980 P.2d at 871-73 (Werdegar, J., concurring). We simply note that we have found no categorical rule that divests "harassing" speech, as defined by federal anti-discrimination statutes, of First Amendment pr otection.

15

C.

In any event, we need not map the precise boundary between permissible anti-discrimination legislation and impermissible restrictions on First Amendment rights today. Assuming for present purposes that the federal anti-discrimination laws are constitutional in all of their applications to pure speech, we note that the SCASD Policy's reach is considerably broader .

For one thing, the Policy prohibits harassment based on personal characteristics that are not pr otected under federal law. Titles VI and IX, taken together with the other relevant federal statutes, cover only harassment based on sex, race, color, national origin, age and disability. The Policy, in contrast, is much broader, r eaching, at the extreme, a catch-all category of "other personal characteristics" (which, the Policy states, includes things like "clothing," "appearance," "hobbies and values," and "social skills"). Insofar as the policy attempts to prevent students from making negative comments about each others' "appearance," "clothing," and"social skills," it may be brave, futile, or merely silly. But attempting to proscribe negative comments about "values," as that ter m is commonly used today, is something else altogether . By prohibiting disparaging speech directed at a person's "values," the Policy strikes at the heart of moral and political discourse--the lifeblood of constitutional self government (and democratic education) and the core concern of the First Amendment. That speech about "values" may offend is not cause for its prohibition, but rather the reason for its protection:"a principal `function of free speech under our system of government is to invite dispute. It may indeed best serve its high purpose when it induces a condition of unrest, creates dissatisfaction with conditions as they are, or even stirs people to anger.' " Texas v. Johnson, 491 U.S. 397, 408-09 (1989) (quoting Terminiello v. Chicago, 337 U.S. 1, 4 (1949)). No court or legislature has ever suggested that unwelcome speech directed at another's "values" may be pr ohibited under the rubric of anti-discrimination.

We do not suggest, of course, that a public school may never adopt regulations more protective than existing law;

it may, provided that those regulations do not offend the Constitution. Such regulations cannot be insulated from First Amendment challenge, however, based on the argument that they do no more than pr ohibit conduct that is already unlawful.

Moreover, the Policy's prohibition extends beyond harassment that objectively denies a student equal access to a school's education resources. Even on a narrow reading, the Policy unequivocally prohibits any verbal or physical conduct that is based on an enumerated personal characteristic and that "has the purpose or effect of substantially interfering with a student's educational performance or creating an intimidating, hostile or offensive environment." (emphasis added). Unlike federal anti-harassment law, which imposes liability only when harassment has "a systemic effect on educational programs and activities," Davis, 526 U.S. at 633 (emphasis added), the Policy extends to speech that merely has the "purpose" of harassing another. This formulation, by focusing on the speaker's motive rather than the effect of speech on the learning environment, appears to sweep in those "simple acts of teasing and name-calling" that the Davis Court explicitly held were insufficient for liability.

D.

The District Court justifies its ruling by a syllogism: (1) the SCASD Policy covers only speech that is alr eady prohibited under federal and state anti-harassment laws; (2) such prohibited speech is not entitled to First Amendment protection; (3) therefor e, the Policy poses no First Amendment problems. This reasoning is flawed in both its major and minor premises. First, the Policy--even narrowly interpreted--covers substantially more speech than applicable federal and state laws. Second, the courts have never embraced a categorical "harassment exception" from First Amendment protection for speech that is within the ambit of federal anti-discrimination laws.

III.

Accordingly, we must examine whether the Policy may be justified as a permissible regulation of speech within the schools.

17

A.

We begin by reviewing the Supreme Court's cases demarcating the scope of a student's right to freedom of expression while in school.9 The Court set out the framework for student free speech claims in Tinker v. Des Moines Independent Community School District, 393 U.S. 503 (1969). In Tinker, a group of students was suspended for wearing black armbands to protest American involvement in the Vietnam War . The Court held that the wearing of the armbands to make a political statement was "closely akin to `pure speech' " and thus was constitutionally protected. Id. at 505. Taking as its premise that "[i]t can hardly be argued that either students or teachers shed their constitutional rights to fr eedom of speech or expression at the schoolhouse gate," id. at 506, the Court reasoned that

> [t]he school officials banned and sought to punish petitioners for a silent, passive expression of opinion, unaccompanied by any disorder or disturbance on the part of the petitioners. There is here no evidence whatever of the petitioners' interference, actual or nascent, with the school's work or of collision with the rights of other students to be secure and left alone. Accordingly, this case does not concern speech or action that intrudes upon the work of the school or the rights of other students.

Id. at 504. Significantly, the Court emphasized that "undifferentiated fear or appr ehension of disturbance is not enough to overcome the right to freedom of expression." Id. at 508.

Under Tinker, then, regulation of student speech is generally permissible only when the speech would substantially disrupt or interfere with the work of the school or the rights of other students. As subsequent

_____

9. We recognize that the SCASD Policy restricts the speech, not only of students, but also of teachers, volunteers and other adult members of the "school community." Because we conclude, however, that the Policy fails under the less stringent standards for the restriction of student speech, we need not address this matter further .

federal cases have made clear, Tinker requires a specific and significant fear of disruption, not just some remote apprehension of disturbance. In Chandler v. McMinnville School District, 978 F.2d 524 (9th Cir . 1992), for example, a middle school punished students who wore"SCAB" buttons to protest replacement teachers during a strike. Because the school had failed to present any evidence that the buttons were "inherently disruptive" to school activities, the court held that students could proceed with their First Amendment claim. In Chalifoux v. New Caney Independent School District, 976 F. Supp. 659 (S.D. T ex. 1997), a high school student challenged his school's policy against gang–related apparel. The school applied the ban to prohibit the plaintiff, a devout Catholic, from wearing a rosary to school on the ground that some gangs had adopted the r osary as their identifying symbol. The court held that the ban failed to satisfy Tinker's substantial disruption test:

> [A]lthough Plaintiffs wore their r osaries outside their shirts for several months, they were never misidentified as gang members nor approached by gang members. There also was no evidence that they attracted the attention of other students because of their r osaries. . . . Accordingly, the Court finds that ther e was insufficient evidence of actual disruption at New Caney High School, or that there was substantial r eason for NCISD to anticipate a disruption, to justify the infringement on Plaintiffs' religiously–motivated speech.

Chalifoux, 976 F. Supp. at 667. Finally, in Clark v. Dallas Independent School District, 806 F. Supp. 116, 120 (N.D. Tex. 1992), the court held that a high school could not prohibit its students from distributing r eligious tracts on school grounds. Again citing Tinker , the court held that "Defendants have failed to establish that Plaintiffs' distribution of the religious tracts gave rise to a material or substantial disruption of the operation" of the school. Id. at 120. Noting that the only evidence of disruption was the objection of several other students, the court observed that "[i]f school officials were per mitted to prohibit expression to which other students objected, absent any further justification, the officials would have a license to prohibit virtually every type of expression." Id .

19

The Tenth Circuit's recent decision in West v. Derby Unified School District No. 260, 206 F .3d 1358 (10th Cir. 2000), which reached a different r esult, nevertheless confirms Tinker's requir ements of specificity and concreteness. In West, a middle school student was suspended for drawing a Confederate flag in math class under a school policy providing that a "student shall not racially harass or intimidate another student by name calling, using racial or derogatory slurs,[or] wearing or possession of items depicting or implying racial hatred or prejudice." Id. at 1361. The Court upheld the suspension under Tinker's substantial disruption standard, finding that the school had demonstrated a concrete thr eat of substantial disruption:

> [B]ased upon recent past events, Derby School District officials had reason to believe that a student's display of the Confederate flag might cause disruption and interfere with the rights of other students to be secure and let alone. . . . The district experienced a series of racial incidents [including "hostile confr ontations" and at least one fight] in 1995, some of which wer e related to the Confederate flag. . . . The Racial Harassment policy enacted in response to this situation was clearly something more than a mere desire to avoid the discomfort and unpleasantness that always accompany an unpopular viewpoint. The history of racial tension in the district made administrators' and par ents' concerns about future substantial disruptions from possession of Confederate flag symbols at school reasonable.

Id. at 1366 (citation omitted). As W est makes clear, the mere desire to avoid "discomfort" or"unpleasantness" is not enough to justify restricting student speech under Tinker. However, if a school can point to a well-founded expectation of disruption--especially one based on past incidents arising out of similar speech--the restriction may pass constitutional muster.

Since Tinker, the Supreme Court has carved out a number of narrow categories of speech that a school may restrict even without the threat of substantial disruption. In Bethel School District No. 403 v. Fraser, 478 U.S. 675

20

(1986), the Court upheld the school's suspension of a high school student who, at a school assembly, nominated a peer for class office through "an elaborate, graphic, and explicit sexual metaphor." Id. at 677. Holding that the student's expression was not protected by the First Amendment, the Court reasoned that

> [t]he schools, as instruments of the state, may determine that the essential lessons of civil, mature conduct cannot be conveyed in a school that tolerates lewd, indecent, or offensive speech and conduct such as that indulged in by this confused boy.

Id. at 683. Distinguishing Cohen v. California, 403 U.S. 15 (1971), in which the Court struck down an adult's conviction for wearing a jacket bearing an obscenity in a public courthouse, the Court explained that

> [i]t does not follow . . . that, simply because the use of an offensive form of expression may not be prohibited to adults making what the speaker considers a political point, the same latitude must be permitted to children in public school. . . . "[T]he First Amendment gives a high school student the classroom right to wear Tinker's armband, but not Cohen's jacket."

Fraser, 478 U.S. at 683 (citations omitted). According to Fraser, then, there is no First Amendment protection for "lewd," "vulgar," "indecent," and "plainly offensive" speech in school. Fraser permits a school to prohibit words that "offend for the same reasons that obscenity offends"--a dichotomy neatly illustrated by the comparison between Cohen's jacket and Tinker's armband. Fraser, 478 U.S. at 685 (quoting FCC v. Pacifica Foundation, 438 U.S. 726, 746 (1978)); see also Hazelwood School District v. Kuhlmeier, 484 U.S. 260, 286 n.2 (Brennan, J., dissenting) (Fraser exception limited "to the appropriateness of the manner in which the message is conveyed, not of the message's content"); East High Gay/Straight Alliance v. Board of Educ. of Salt Lake City Sch. Dist., 81 F. Supp. 2d 1166, 1193 (D. Utah 1999) ("Fraser speaks to the for m and manner of student speech, not its substance. It addresses the mode of expression, not its content or viewpoint.").

21

Finally, in Hazelwood School District v. Kuhlmeier, 484 U.S. 258 (1988), the Court upheld, against First Amendment challenge, a principal's deletion of student articles on teen pregnancy from a school-sponsored newspaper. Distinguishing Tinker , the Court noted the school had not opened the newspaper up as a public forum and therefore could "exercis[e] editorial control over the style and content of student speech in school-sponsored expressive activities as long as [its] actions are reasonably related to legitimate pedagogical concer ns." Id. at 273 (emphasis added). As the Court reasoned,

> [t]he question whether the First Amendment r equires a school to tolerate particular student speech––the question that we addressed in Tinker ––is different from the question whether the First Amendment requir es a school affirmatively to promote particular student speech. The former question addresses educators' ability to silence a student's personal expr ession that happens to occur on the school premises. The latter question concerns educators' authority over school-sponsored publications, theatrical productions, and other expressive activities that students, par ents, and members of the public might reasonably per ceive to bear the imprimatur of the school. . . . Educators are entitled to exercise greater contr ol over this second form of student expression . . . .

Id. at 270-71. In Rosenberger v. Rector & Visitors of University of Virginia, 515 U.S. 819 (1995), the Court made clear that Hazelwood's permissive"legitimate pedagogical concern" test governs only when a student's school-sponsored speech could reasonably be viewed as speech of the school itself:

> [W]hen the State is the speaker, it may make content-based choices. When the University determines the content of the education it provides, it is the University speaking, and we have permitted the gover nment to regulate the content of what is or is not expr essed when it is the speaker or when it enlists private entities to convey its own message. . . . It does not follow, however . . . that viewpoint-based restrictions are proper when the University does not itself speak or

22

> subsidize transmittal of a message it favors but instead encourage[s] a diversity of views from private speakers. A holding that the University may not discriminate based on the viewpoint of private persons whose speech it facilitates does not restrict the University's own speech, which is controlled by differ ent principles. See, e.g., . . . Hazelwood School Dist. v. Kuhlmeier, [484 U.S. at 270-72].

Rosenberger, 515 U.S. at 834. Similarly, a post-Hazelwood case from the Seventh Circuit illustrates that school "sponsorship" of student speech is not lightly to be presumed. See Hedges v. Wauconda Comm. Unit Sch. Dist. No. 118, 9 F.3d 1295, 1299 (7th Cir . 1993). In striking down a blanket prohibition against distributing religious materials on school grounds, the Hedges Court rejected the argument that the ban was justified under Hazelwood because observers might "infer that the school endorses whatever it permits":

> [The School District] proposes to thr ow up its hands, declaring that because misconceptions are possible it may silence its pupils, that the best defense against misunderstanding is censorship. . . . Public belief that the government is partial does not per mit the government to become partial. Students ther efore may hand out literature even if the recipients would misunderstand its provenance. The school's pr oper response is to educate the audience rather than squelch the speaker.

Hedges, 9 F.3d at 1299; see also Burch v. Barker, 861 F.2d 1149, 1159 (9th Cir. 1998) ("under ground newspaper" distributed on school grounds could not r easonably be viewed as school-sponsored).

To summarize: Under Fraser, a school may categorically prohibit lewd, vulgar or profane language. Under Hazelwood, a school may regulate school-sponsored speech (that is, speech that a reasonable observer would view as the school's own speech) on the basis of any legitimate pedagogical concern. Speech falling outside of these categories is subject to Tinker's general rule: it may be regulated only if it would substantially disrupt school

23

operations or interfere with the right of others. See Chandler, 978 F.2d at 529; Pyle v. South Hadley Sch. Comm., 861 F. Supp. 157, 166 (D. Mass. 1994).

IV.

We turn now to the SCASD Policy itself. Saxe levies facial challenges against the Policy on both overbreadth and vagueness grounds. Because we hold that the Policy, even narrowly read, is unconstitutionally overbroad, we do not reach the merits of Saxe's vagueness claim.

A.

A regulation is unconstitutional on its face on overbreadth grounds where there is a "a likelihood that the statute's very existence will inhibit free expression" by "inhibiting the speech of third parties who are not before the Court." Members of City Council v. Taxpayers for Vincent, 466 U.S. 789, 799 (1984). To render a law unconstitutional, the overbreadth must be "not only real but substantial in relation to the statute's plainly legitimate sweep." Broadrick v. Oklahoma, 413 U.S. 601, 615 (1973).

On first reading, the Policy on its face appears both unconstitutionally vague and overbroad. As an initial matter, the Policy contains several separate passages, each of which could be read as embodying its operative definition of banned speech. The Policy's second paragraph sets forth one definition:

> Harassment means verbal or physical conduct based on one's actual or perceived race, religion, color, national origin, gender, sexual orientation, disability, or other personal characteristics, and which has the purpose or effect of substantially interfering with a student's educational performance or creating an intimidating, hostile or offensive environment.

This, however, is immediately followed two paragraphs later by a statement that harassment under the Policy "can include any unwelcome verbal, written or physical conduct which offends, denigrates or belittles an individual because of any of the characteristics described above." In addition,

24

in a separate section, the Policy purports to set out "definitions" for various categories of harassment that do not always coincide with the above-quoted language. Religious harassment, for example, is defined as "unwelcome verbal, written or physical conduct directed at the characteristics of a person's religion, such as derogatory comments regarding sur names, religious tradition, or religious clothing, or religious slurs, or graffiti."

Certainly, some of these purported definitions of harassment are facially overbroad. No one would suggest that a school could constitutionally ban "any unwelcome verbal . . . conduct which offends . . . an individual because of " some enumerated personal characteristics. Nor could the school constitutionally restrict, without more, any "unwelcome verbal . . . conduct directed at the characteristics of a person's religion." The Supreme Court has held time and again, both within and outside of the school context, that the mere fact that someone might take offense at the content of speech is not sufficient justification for prohibiting it. See T inker, 393 U.S. at 509 (school may not prohibit speech based on the"mere desire to avoid the discomfort and unpleasantness that always accompany an unpopular viewpoint");  T exas v. Johnson, 491 U.S. 397, 414 (1989) ("If there is a bedrock principle underlying the First Amendment, it is that the gover nment may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable."); Street v. New York, 394 U.S. 576, 592 (1969) ("It is firmly settled that . . . the public expression of ideas may not be prohibited merely because the ideas ar e themselves offensive to some of their hearers."); see also Doe v. University of Michigan, 721 F. Supp. 852, 863 (E.D. Mich. 1989) (striking down university speech code: "Nor could the University proscribe speech simply because it was found to be offensive, even gravely so, by large numbers of people.").

Before declaring the Policy unconstitutional, however, we must first determine whether it is susceptible to a reasonable limiting construction: "the elementary rule is that every reasonable construction must be r esorted to, in order to save a statute from unconstitutionality."10 Stretton
_____

10. Saxe's citation to Hynes v. Mayor & Council of Borough of Oradell, 425 U.S. 610 (1976), ostensibly for the proposition that federal courts

v. Disciplinary Bd. of the Supreme Court of Pennsylvania, 944 F.2d 137, 144 (3d Cir. 1991) (citations omitted); see also Hoffman Estates v. Flipside, Hof fman Estates, 455 U.S. 489, 494 n.4 (1982) ("In evaluating a facial challenge to a state law, a federal court must, of course, consider any limiting construction."); Broadrick , 413 U.S.at 617 n.16 ("a federal court must determine what a state statute means before it can judge its facial unconstitutionality").

When the Policy is read as a whole, it appears that its operative definition of prohibited harassment is contained in the above-quoted second paragraph, which r equires that speech either "substantially interfer[e] with a student's educational performance or creat[e] an intimidating, hostile or offensive environment." The Policy's fourth paragraph and "Definitions" section could reasonably be read as merely listing examples of conduct that might (but would not necessarily) violate this operative definition. On this narrow reading, the second paragraph would supply the Policy's "formal" definition of pr ohibited harassment, but the other sections of the Policy could still be r elevant in clarifying vague or ambiguous terms in that operative definition.

So narrowed, the Policy would requir e the following elements before speech could be deemed harassing: (1) verbal or physical conduct (2) that is based on one's actual or perceived personal characteristics and (3) that has the purpose or effect of either (3a) substantially interfering with a student's educational performance or (3b) creating an intimidating hostile, or offensive envir onment.

_____

may not give a narrowing construction to a local statute, is inapposite. In Hynes, the New Jersey Supreme Court had already authoritatively construed the scope of the challenged statute. The U.S. Supreme Court held that the state court's narrowing construction failed to solve the law's vagueness problems and that, in light of the existing authoritative interpretation, the federal courts were without power to further limit the statute. See 425 U.S. at 622. Here, in contrast, the SCASD Policy has not been authoritatively construed by the state courts, and we are therefore required to give it a reasonable narrowing construction if necessary to save it from unconstitutionality.

26

It is apparent from these elements that SCASD cannot take solace in the relatively more per missive Fraser or Hazelwood standards. First, the Policy does not confine itself merely to vulgar or lewd speech; rather , it reaches any speech that interferes or is intended to interfere with educational performance or that cr eates or is intended to create a hostile environment. While some Fraser-type speech may fall within this definition, the Policy's scope is clearly broader. Second, the Policy does not contain any geographical or contextual limitations; rather , it purports to cover "[a]ny harassment of a student by a member of the school community." Thus, its strictures pr esumably apply whether the harassment occurs in a school sponsor ed assembly, in the classroom, in the hall between classes, or in a playground or athletic facility.11 Obviously, the Policy covers far more than just Hazelwood-type school-sponsored speech; it also sweeps in private student speech that merely "happens to occur on the school premises." Hazelwood, 484 U.S. at 271. As a result, SCASD cannot r ely on Hazelwood's more lenient "legitimate pedagogical concern" test in defending the Policy from facial attack.

In short, the Policy, even narrowly read, prohibits a substantial amount of non-vulgar, non-sponsor ed student speech. SCASD must therefore satisfy the Tinker test by showing that the Policy's restrictions ar e necessary to prevent substantial disruption or inter ference with the work of the school or the rights of other students. Applying this test, we conclude that the Policy is substantially overbroad.

As an initial matter, the Policy punishes not only speech that actually causes disruption, but also speech that merely intends to do so: by its terms, it covers speech "which has the purpose or effect of " interfering with educational performance or creating a hostile environment.

_____

11. Indeed, Saxe even suggests that the Policy could even be read to cover conduct occurring outside of school pr emises. This reading is not implausible based on the Policy's plain language, and would raise additional constitutional questions. See, e.g. , Boucher v. School Board of
the School District of Greenfield, 134 F.3d 821, 828 (7th Cir. 1998) ("school officials' authority over off-campus expression is much more limited than it is over expression on school gr ounds"); Klein v. Smith, 635 F. Supp. 1440 (D. Me. 1986) (student's vulgarity directed at teacher off school premises was "too attenuated to support discipline").

27

This ignores Tinker's requir ement that a school must reasonably believe that speech will cause actual, material disruption before prohibiting it.

In addition, even if the "purpose" component is ignored, we do not believe that prohibited "harassment," as defined by the Policy, necessarily rises to the level of a substantial disruption under Tinker. We agr ee that the Policy's first prong, which prohibits speech that would"substantially interfer[e] with a student's educational performance," may satisfy the Tinker standard. The primary function of a public school is to educate its students; conduct that substantially interferes with the mission is, almost by definition, disruptive to the school envir onment.

The Policy's second criterion, however--which pr ohibits speech that "creat[es] an intimidating, hostile or offensive environment"--poses a more difficult problem. There are several possible grounds on which SCASD could attempt to justify this prohibition. First, SCASD could ar gue that it has an interest in avoiding liability for harassment under Franklin and Davis. However, because the Policy prohibits substantially more conduct than would give rise to liability under these cases, this justification is unavailing.

Second, SCASD could argue that speech cr eating a "hostile environment" may be banned because it "intrudes upon . . . the rights of other students." T inker, 393 U.S. at 504. The precise scope of Tinker's  "interference with the rights of others" language is unclear; at least one court has opined that it covers only independently tortious speech like libel, slander or intentional infliction of emotional distress. See Slotterback v. Interbor o Sch. Dist., 766 F. Supp. 280, 289 n.8 (E.D. Pa. 1991); see also Kuhlmeier v. Hazelwood Sch. Dist., 795 F.2d 1368, 1375 (8th Cir.), rev'd on other grounds, 484 U.S. 260 (1986). In any case, it is certainly not enough that the speech is merely offensive to some listener. See, e.g., Rivera , 721 F. Supp. at 1191. Because the Policy's "hostile environment" prong does not, on its face, require any threshold showing of severity or pervasiveness, it could conceivably be applied to cover any speech about some enumerated personal characteristics the content of which offends someone.12  This could include

_____

12. Such a reading would be consistent with the Policy's very broad statement of purpose, which notes that "[m]embers of the school

much "core" political and religious speech: the Policy's "Definitions" section lists as examples of covered harassment "negative" or "derogatory" speech about such contentious issues as "racial customs," "r eligious tradition," "language," "sexual orientation," and"values." Such speech, when it does not pose a realistic threat of substantial disruption, is within a student's First Amendment rights.

Finally, SCASD might argue that the "hostile environment" prohibition is requir ed to maintain an orderly and non-disruptive educational environment. However, as Tinker made clear, the "undif ferentiated fear or apprehension of disturbance" is not enough to justify a restriction on student speech. Although SCASD correctly asserts that it has a compelling interest in pr omoting an educational environment that is safe and conducive to learning, it fails to provide any particularized reason as to why it anticipates substantial disruption fr om the broad swath of student speech prohibited under the Policy.

The Policy, then, appears to cover substantially mor e speech than could be prohibited under T inker's substantial disruption test. Accordingly, we hold that the Policy is unconstitutionally overbroad.

V.

For the foregoing reasons, the judgment of the District Court is reversed.

_____

community are expected to treat each other with mutual respect" and that "[d]isrespect among members of the school community is unacceptable behavior."

APPENDIX

STATE COLLEGE AREA SCHOOL DISTRICT
State College PA 16801

ANTI-HARASSMENT POLICY
(approved August 9, 1999)

GENERAL STATEMENT OF POLICY

The State College Area School District is committed to
providing all students with a safe, secur e, and nurturing
school environment. Members of the school community are
expected to treat each other with mutual r espect.
Disrespect among members of the school community is
unacceptable behavior which threatens to disrupt the
school environment and well being of the individual.

Harassment means verbal or physical conduct based on
one's actual or perceived race, religion, color, national
origin, gender, sexual orientation, disability, or other
personal characteristics, and which has the purpose or
effect of substantially interfering with a student's
educational performance or creating an intimidating,
hostile or offensive environment.

According to state law (18 Pa. C.S.A. ~2709), an individual
commits the crime of harassment when, with intent to
harass, annoy or alarm another person, the individual
subjects, or attempts or threatens to subject, the other
person to unwelcome physical contact; follows the other
person in or about a public place or places; or behaves in
a manner which alarms or seriously annoys the other
person and which serves no legitimate purpose.

Harassment can include any unwelcome verbal, written or
physical conduct which offends, denigrates, or belittles an
individual because of any of the characteristics described
above. Such conduct includes, but is not limited to
unsolicited derogatory remarks, jokes, demeaning
comments or behavior, slurs, mimicking, name calling,
graffiti, innuendo, gestures, physical contact, stalking,
threatening, bullying, extorting or the display or circulation
of written materials or pictures.

It is the policy of the State College Area School District to
oppose and prohibit, without qualification harassment

based on race, color, religion, national origin, gender, sexual orientation, disability, and other for ms of harassment. Harassment is not only a form of discrimination, but also disrespectful behavior which will not be tolerated.

Any harassment of a student by a member of the school community is a violation of this policy.

The State College Area School District shall act to investigate all complaints of harassment, either for mal or informal, verbal or written, and will take appropriate action against any member of the school community who is found to have violated this policy.

It is a separate and distinct violation of this policy for any member of the school community to retaliate against any person who reports alleged harassment or against any person who testifies, assists or participates in an investigation, proceeding or hearing relating to such harassment. It is possible that an alleged harasser may be found to have violated this anti-retaliation pr ovision even if the underlying complaint of harassment is not found to be a violation of this policy. Retaliation includes, but is not limited to any form of intimidation, r eprisal or harassment and may be redressed through application of the same reporting, investigation, and enforcement procedures as for harassment. In addition, a person who knowingly makes a false report may be subject to the same action that the State College Area School District may take against any other individual who violates this policy. The ter m "false report" refers only to those made in bad faith and does not include a complaint that could not be corroborated or which did not rise to the level of harassment.

Any school employee or student who is found to have violated this policy shall be subject to action including, but not limited to warning, remedial training, education or counseling, suspension, exclusion, expulsion, transfer, termination or discharge, and legal action under state and federal statutes.

DEFINITIONS

School community includes, but is not limited to, all students, school employees, contractors, unpaid volunteers, school board members, and other visitors.

31

School employee includes, but is not limited to, all teachers, support staff, administrators, bus drivers, custodians, cafeteria workers, coaches, volunteers, and agents of the school.

Sexual harassment means unwelcome sexual advances, requests for sexual favors and other verbal or physical conduct of a sexual nature when:

> (a) submission to that conduct is made either explicitly or implicitly a term or condition of a student's education;

> (b) submission to or rejection of such conduct by a student is used as a component of the basis for decisions affecting that student;

> (c) the conduct has the purpose or effect of substantially interfering with a student's educational performance or creating an intimidating, hostile or offensive educational environment.

This applies whether the harassment is between people of the same or different gender. Sexual harassment can include unwelcome verbal, written or physical conduct, directed at or related to a person's gender, such as sexual gossip or personal comments of a sexual natur e, sexually suggestive or foul language, sexual jokes, whistling, spreading rumors or lies of a sexual natur e about someone, demanding sexual favors, forcing sexual activity by threat of punishment or offer of educational r eward, obscene graffiti, display or sending of pornographic pictures or objects, offensive touching, pinching, grabbing, kissing or hugging or restraining someone's movement in a sexual way.

Racial and color harassment can include unwelcome verbal, written, or physical conduct directed at the characteristics of a person's race or color, such as nicknames emphasizing stereotypes, racial slurs, comments on manner of speaking, and negative refer ence to racial customs.

Harassment on the basis of religion is unwelcome verbal, written or physical conduct directed at the characteristics of a person's religion, such as derogatory comments

regarding surnames, religious tradition, or religious clothing, or religious slurs, or graffiti.

Harassment on the basis of national origin is unwelcome verbal, written or physical conduct directed at the characteristics of a person's national origin, such as negative comments regarding surnames, manner of speaking, customs, language, or ethnic slurs.

Harassment on the basis of sexual orientation is unwelcome verbal, written or physical conduct dir ected at the characteristics of a person's perceived sexual orientation, such as negative name calling and degrading behavior.

Disability harassment includes harassment based on a person's disabling mental or physical condition and includes any unwelcome verbal, written or physical conduct, directed at the characteristics of a person's disabling condition, such as imitating manner of speech or movement, or interference with necessary equipment.

Other harassment on the basis of such things as clothing, physical appearance, social skills, peer group, income, intellect, educational program, hobbies or values, etc. may also cause or effect substantial inter fering with a student's educational performance or creating an intimidating, hostile or offensive environment. This type of harassment is also protected against by this policy and pr ocedures.

PROCEDURES FOR IMPLEMENTATION OF ANTI- HARASSMENT POLICY

Reporting

Any school employee who observes, overhears or otherwise witnesses harassment, which may be unlawful, or to whom such harassment is reported, must take pr ompt and appropriate action to stop the harassment and to prevent its recurrence.

In the event that the school employee is unable to personally take prompt and appropriate action, the employee must report the incident or complaint in writing, ordinarily within one school day, to the appr opriate school complaint official(s) designated by this policy.

33

Any student or other person who believes that harassment of a student has occurred shall inform any school employee or one of the harassment complaint officials.

Any student who believes that he/she has been the target of harassment as defined in this policy may bring his/her complaint to the attention of any school employee or the harassment complaint official(s). The complaint may be made either orally or in writing. The following ar e the harassment complaint officials:

Principal in each building or his/her designee

or

Personnel Director

If one of the harassment complaint officials is the person alleged to be engaged in the harassment, the complaint shall be filed with one of the alternative officials or any other school employee the student chooses.

Process

Informal Procedure

It may be possible to resolve a complaint thr ough a voluntary conversation between the complaining student and the alleged harasser which is facilitated by a school employee or by a designated harassment complaint official. The State College Area School District believes that this Informal Procedure may be an opportunity for educating students regarding what may not be understood to be offensive. In addition, those trained in mediation may provide an avenue to resolve issues of harassment in a problem-solving model. If the complaining student or alleged harasser is a student under the age of 18, the harassment complaint official should notify the student's parent(s)/guardian(s) if, after initial consultation with the student, it is determined to be in the best interests of the student. Both the complaining student and the alleged harasser may be accompanied by a person of his/her choice for support and guidance. If the complaining student and the alleged harasser feel that a resolution has been achieved, then the conversation may remain confidential and no further action is necessary. The results of an

informal resolution shall be reported by the facilitator, in writing, to the superintendent and to the school principal.

If the complaining student, the alleged harasser , or the school employee/harassment complaint official, chooses not to utilize the informal procedure, or believes that the informal procedure has been unsuccessful, he/she may proceed to the formal procedur e. Any complaint against a school employee shall be handled through the formal procedure.

Formal Procedure

Step 1

The harassment complaint official shall fill out a harassment complaint form based on the written or verbal allegations of the complaining student. This complaint form shall be kept in a centralized and secure location.

> (a) The complaint form shall detail the facts and circumstances of the incident or patter n of behavior.
>
> (b) If a student under 18 years of age is involved, his/her parents shall be notified immediately unless, after consultation with the student, it is deter mined not to be in the best interests of the student.
>
> (c) An investigation shall be completed by the harassment complaint official within 14 calendar days from the date of the complaint or report.

Step 2

The investigation may consist of personal interviews with the complaining student, the alleged harasser and any other individuals who may have knowledge of the alleged incident(s) or circumstances giving rise to the complaint. In determining whether alleged conduct constitutes a violation of this policy, the harassment complaint official should consider the surrounding circumstances, any relevant documents, the nature of the behavior, past incidents or past or continuing patterns of behavior , the relationships between the parties involved and the context in which the alleged incidents occurred. Whether a particular action or incident constitutes a violation of this policy r equires a

determination based on all the facts and surr ounding circumstances.

In addition, the State College Area School District may take immediate steps, at its discretion, to pr otect the complaining student, alleged harasser, witnesses, and school employees pending completion of an investigation of alleged harassment and may make any appropriate referrals for assistance, including but not limited to counseling, rape crisis intervention, notification of police, etc.

The investigation will be completed as soon as practicable, but no later than 10 school days from the complaint or report. The harassment complaint official shall make a written report to the superintendent and the school principal upon completion of the investigation. The report shall include a determination as to whether the allegations have been substantiated as factual and whether they appear to be violations of this policy.

Step 3

Following the investigation, the harassment complaint official shall recommend to the superintendent and/or school principal what action, if any, is requir ed. The State College Area School District shall take appr opriate action in all cases where the harassment complaint official concludes that this policy has been violated. Any person who is determined to have violated this policy shall be subject to action, including but not limited to warning, exclusion, suspension, expulsion, transfer, termination, discharge or any other remedial action, including but not limited to training, education, or counseling. Action taken for violation of this policy shall be consistent with the requirements of any applicable collective bargaining agreement, State College Area School District policy, state and federal law, including but not limited to the due process protections for students with disabilities.

Step 4

The Director of Personnel or school principal shall maintain the written report of the investigation and r esults in his/her office. In the case of an investigation conducted by

36

the school district, the superintendent shall r eceive a copy of the investigation report and results. If the harassment complaint official concludes that the policy has been violated by a professional educator or administrator, a report of the findings shall be filed in the district employee's personnel file.

The complaining student and the alleged harasser shall be informed of the results of the investigation, including whether the allegations were found to be factual, whether there was a violation of the policy, and whether disciplinary action was or will be taken.

REPORTING OF POTENTIAL PHYSICAL AND/OR
SEXUAL ABUSE

Several behaviors listed as sexual harassment (i.e., sexual touching, grabbing, pinching, being forced to kiss someone, being forced to do something sexual other than kissing, sexual assault) may also constitute physical or sexual abuse. Physical abuse is defined as inflicting intentional bodily harm. Sexual abuse is defined as any act or acts by a person involving sexual molestation or exploitation of another person, including but not limited to incest, prostitution, rape, sodomy or any lewd or lascivious conduct. Thus, under certain circumstances, alleged harassment may also be possible physical and/or sexual abuse under Pennsylvania law. Such harassment or abuse is subject to the duties of mandatory reporting and must be reported to the appropriate authorities within 24 hours of the time the educator becomes aware of the suspected abuse. (Reference State College Area School District Policy #806)

CONFIDENTIALITY

The State College Area School District r ecognizes that both the complaining student and the alleged harasser have strong interests in maintaining the confidentiality of the allegations and related information. The privacy of the complaining student, the individual(s) against whom the complaint is filed, and the witnesses will be r espected as much as possible, consistent with legal obligations to investigate, to take appropriate action, and to comply with any discovery or disclosure obligations.

ALTERNATIVE COMPLAINT PROCEDURES

In addition to, or instead of, filing a harassment complaint through this policy, a person may choose to exercise other options, including but not limited to filing a complaint with outside agencies including the police or filing a private lawsuit.

Outside Agencies

A charge of harassment may also be investigated by the Pennsylvania Human Relations Commission, the Pennsylvania Department of Education, or the Office for Civil Rights of the U.S. Department of Education which may be contacted as follows:

> PA Human Relations Commission
> Harrisburg Regional Office
> 1101-1125 South Front Street
> Harrisburg, PA 17104
> Phone: (717)787-9784
> TTY: (717) 787-7279
>
> Pennsylvania Department of Education
> 333 Market Street
> Harrisburg, PA 17126-0333
> Phone: (717) 787-2644
> TTY: (717) 783-8445
>
> Office for Civil Rights, Philadelphia Office
> U.S. Department of Education
> 3535 Market Street, Room 6300, 03-2010
> Philadelphia, PA 19104-3326
> Phone: (215) 596-6787
> TTY: (215) 596-6794

LITIGATION

A student who has been harassed may file a lawsuit under a number of federal or state statutes (including T itles IV, VI, and IX of the Federal Civil Rights Act of 1964, the Rehabilitation Act of 1973 and appropriate Pennsylvania laws). He or she or his/her parent(s) should consult with a private attorney about these rights and options.

NOTICE AND PUBLICATION

The State College Area Board of School Dir ectors shall provide notice of the policy and procedur es to students,

custodial parents or guardians and school employees. Notice to students shall be in age-appropriate language and should include examples of harassment. At a minimum, the policy shall be conspicuously posted throughout each school building in areas accessible to all members of the school community. The notice shall also appear in the school handbook and any other publication of the school district that sets forth the comprehensive rules, procedures and standards of conduct for the school. Ther e shall be procedures for publicizing, on an annual basis, the identity of the harassment complaint officials who ar e designated to receive complaints. The board shall use its discretion in developing and initiating age-appropriate pr ograms to effectively inform students and school employees about the substance of the policy and procedures in order to help prevent harassment.

RENDELL, Circuit Judge, concurring:

I write separately only to note my strong disagreement with the notion, espoused by the District Court and discussed at length in Part II.B of the majority opinion, that the judicial analysis of permissible r estrictions on speech in a given setting should be affected -- let alone dictated -- by legislative enactments intended to proscribe activity that could be classified as "harassment." Our attempt at reasoning through this postulate should demonstrate its futility, given the numerous variables that impact on any determination regarding the limits of permissible speech and the rigorous analysis that we must follow in every First Amendment case -- the analysis that our opinion does in fact follow in reaching the result in this case.

Perhaps the only way, or time, that such legislation could be a guide would be if its provisions wer e identical to the policy at issue, or if in a case involving an as-applied challenge to a policy, the legislative provisions addressed every aspect of the particular factual setting at issue. Even then, I submit that it would be the reasoning by a court upholding its constitutionality, rather than the legislation itself, that would provide the necessary guidance.

I view the use of harassment legislation as an especially inappropriate barometer here because this case is not a harassment case. Rather, it is framed by appellants as a First Amendment speech case. Moreover, it is a school speech case. While reliance on provisions of harassment laws or policies might be an easy way to resolve difficult cases such as this one, therein lies the rub-- there are no easy ways in the complex area of First Amendment jurisprudence.

A True Copy:
Teste:

      Clerk of the United States Court of Appeals
      for the Third Circuit